## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 13 2018, 10:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kyle Baker,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 13, 2018

Court of Appeals Case No.
82A01-1707-CR-1576

Appeal from the Vanderburgh
Circuit Court

The Honorable David D. Kiely,
Judge

Trial Court Cause No.
82C01-1604-MR-2074

**Barnes, Judge.**

# Case Summary

Kyle Baker appeals his convictions and aggregate forty-five-year sentence for Level 2 felony voluntary manslaughter and an enhancement for committing the underlying offense with a firearm.  We affirm.

# Issues

The issues before us are as follows:

> I.      whether the trial court erred in refusing Baker's tendered jury instruction as to reckless homicide;

> II.      whether the trial court abused its discretion in sentencing him by finding an improper aggravating circumstance; and

> III.      whether Baker's aggregate forty-five-year sentence is inappropriate in light of the nature of his offense and his character.

# Facts

On April 8, 2016, Baker and his girlfriend, Brandi Smith ("Brandi"), traveled to Evansville to collect a $75 debt that was owed to Baker by his brother, Malechi Baker ("Malechi").  Baker had difficulty tracking Malechi and called his cell phone repeatedly.  Malechi had left his cell phone with his and Baker's "good friend," Robert Ocke-Hall.  Tr. Vol. IV p. 141.  When Ocke-Hall answered Malechi's phone, Baker demanded to know Malechi's whereabouts.  Baker felt that he was "g[etting] the runaround" and that Ocke-Hall "was trying to over

talk [him]"; after a heated exchange, the men threatened one another. *Id*. at 142, 132.

[4]     Baker subsequently learned that Malechi was near Fares Avenue and, accompanied by Brandi, went to find him. At approximately 6:30 P.M., Baker saw Ocke-Hall walking on Fares Avenue. Baker pulled out his Smith and Wesson semi-automatic handgun, pointed it at Ocke-Hall, and ran toward him. Baker shot Ocke-Hall in the chest at close range and fled with Brandi. Witnesses reported seeing a man and a woman fleeing the scene and described the woman as wearing multi-colored, printed leggings. The video surveillance system of a nearby business captured the shooting. Ocke-Hall died from his injuries.

[5]     At approximately midnight, an Evansville Police Department officer pulled over a speeding vehicle and observed a large bag of a green leafy substance in plain view on the rear floor board. Baker was seated in the rear driver's side seat and the bag, later determined to contain synthetic marijuana, lay at his feet. Brandi was seated immediately next to him and was wearing colorful, tie-dyed leggings. The officer arrested Baker. From jail, Baker relayed a message to the police that he wanted to speak with them.

[6]     Baker made multiple jailhouse telephone calls to Brandi from jail. The conversations were recorded and later reviewed by law enforcement. In one such phone conversation that occurred before Baker spoke with the police, he stated, ". . .[T]hey have, they've got a video, I was intoxicated, I wasn't trying

to (inaudible), I'm trying to get an involuntary manslaughter and sign something . . . ." *Id*. at 105.

[7] Evansville Police Department Detectives Jennifer Cueto and Keith Whitler interviewed Baker at the Vanderburgh County Jail on April 14, 2016.[1] They advised Baker of his right to have an attorney present during the interview; Baker waived his right to counsel. Baker then told the police officers that he and Ocke-Hall were "good friend[s]" and that he was under the influence of "Roxy's and f***** dope and uppers and downers . . . and that's why [he] didn't remember . . . ." *Id*. at 141, 126. He added that he "just wish[ed] [he] could take it all back." *Id*. at 127. Detective Cueto asked Baker to "tell . . . whatever [he] want[ed] to tell," and Baker responded as follows:

> [Baker]: I wasn't sure whether [Ocke-Hall] was reaching for a gun or not when I pulled my gun but it just misfired. . . .
>
> \* \* \* \* \*
>
> . . . [I]t was all a misunderstanding and I do apologize for everything. I've had almost a week to think about this and it's tore me up.
>
> \* \* \* \* \*
>
> [Baker]: I just remember, I just remember drawing my gun because I thought I was about to get shot at, like I don't know

---

[1] The trial court admitted the videorecording of the interview at trial.

what made me think that, if it was like a (inaudible) in my mind or something,

* * * * *

[Baker]: . . . I think I remember him reaching for something and I might have thought that's what he was doing, he was trying to shoot me, that's what I'm saying, I might have just blacked out and freaked out.

* * * * *

DETECTIVE CUETO: * * * * * Where did you go?

[Baker]: I don't remember, I just ran and I freaked out because I knew that I did, I'm sorry, I messed up bad.

* * * * *

[Baker]: Yeah. Is there anything I can do to help myself instead of hurting me, like you said you were going to try and use all of this against me to prosecute me, I mean I don't want, I don't want my life just to sit in prison, I don't.

DETECTIVE CUETO: * * * * * I mean I made it pretty clear that anything you say I will use against you in the court of law.

[Baker]: Uh-huh. (affirmative). I just don't want everybody to think that I did this with malicious intent because I didn't, it was an accident, I mean I was on drugs, I don't even remember none of this, so I-

DETECTIVE CUETO: Well you remember some of it, I mean you said that.

[Baker]: Yeah, that's what I'm saying, I was like in and out of drug induced blackout for like, for that whole two days, like there's parts I remember and parts I don't, and then towards the end there was just the worst because I know I was, I did a lot that day.

Tr. Vol. IV p. 131, 137, 138, 139, 147-48. Baker "vacillated between a claim that the shooting was [an] accidental [gun misfire] and a claim that he blacked out from drug use and did not remember the shooting." Appellant's Br. p. 19.

[8]   In another recorded phone call with Brandi, this one occurring after he was interviewed by police, Baker stated the following:

THE DEFENDANT: Yeah, do not talk to them, no more, don't say anything because if they cross examine on statements and they're different now, they're going to be sh****. Don't talk to them at all.

[Brandi]: Okay.

THE DEFENDANT: But, I basically told them like I was on drugs and I blacked out, f****** I don't remember, I told them we met at, somewhere in Jimtown and walked back to Fares, I told them-

[Brandi]: Ahhhh.

THE DEFENDANT: What? * * * * *

[Brandi]: Okay.

THE DEFENDANT: And then we walked back to Fares together.

[Brandi]: But yeah-

THE DEFENDANT: And I told them I don't even remember f******, I don't remember nothing really like I don't remember being at Westbrook, I don't remember, about half of it I was basically blacked out from drugs, but I don't know if I helped or hurt myself for real.

[Brandi]: Oh my God.

THE DEFENDANT: Like I feel like I should have never even f****** went and talked to them, but I'm just trying to get like, what's it called, it's not involuntary manslaughter, it's f******, it's something like where you accidentally commit homicide.

* * * * *

[Brandi]:. . . I told them that we didn't walk, we didn't walk to Fares together.

THE DEFENDANT: Really?

[Brandi]: Yeah, I told them that.

THE DEFENDANT: F***.

* * * * *

THE DEFENDANT: Oh, f***, our stories aren't even the same, they're probably mad.

[Brandi]: Yeah, that's not good.

THE DEFENDANT: No.

Tr. Vol. IV pp. 151-52,153-54.

[9] On April 11, 2016, the State charged Baker with murder. The State filed additional informations on May 5 and November 10, 2016, respectively, seeking sentence enhancements for Baker's use of a firearm and for a life sentence without the possibility of parole. Baker was tried by a jury on May 8-10, 2017.

[10] Law enforcement witnesses testified to the foregoing facts on behalf of the State. The State also called an Indiana State Police ballistics expert who testified that performance impact testing on Baker's handgun had established that it would only fire when the trigger was deliberately pulled.

[11] During the course of the trial, the following colloquy ensued between defense counsel and the trial court:

[DEFENSE COUNSEL]: I frankly believe when you watch the entire interview [of Baker] that self-defense[,] involuntary manslaughter[,] and reckless homicide all become valid jury instructions, but you haven't seen the interview.

THE COURT: Exactly, I haven't seen them.

* * * * *

> THE COURT: And I have to see all of the evidence before I
> know whether or not the instructions are appropriate.

*Id*. at 113.

[12] At the close of the evidence, Baker tendered proposed final instructions, including instructions on reckless homicide. Defense counsel made the following record:

> I've also tendered reckless homicide, instruction 6, and then the definition of recklessly, instruction 7. I think the evidence supports that there is a serious evidentiary dispute as to mens rea, knowing and intentional have been given, and I believe that the evidence presented by the State at the very least, not withstanding the evidence presented by the defense, permits it, should allow the Court or should require the Court to give reckless homicide.

*Id*. at 208. The State objected to Baker's reckless homicide instructions. *See* App. Vol. II pp. 122-23. Subsequently, although the trial court accepted Baker's tendered instructions regarding voluntary manslaughter and self-defense, it declined—based upon the evidence it heard at trial—to instruct the jury on reckless homicide.

[13] The jury found Baker guilty of the lesser-included offense of Level 2 felony voluntary manslaughter. Baker subsequently pled guilty to use of a firearm during commission of a felony.

[14] At Baker's sentencing hearing on June 8, 2017, the trial court found, as aggravating circumstances, the following: (1) Baker's prior juvenile and adult criminal history; (2) the pre-sentence investigation report indicated that Baker had a high risk to re-offend; (3) his lack of remorse; (4) his failure to take responsibility for his actions; (5) his unwillingness to enter a guilty plea; (6) he shot and left Ocke-Hall bleeding without attempting to render aid; and (7) his use of illicit drugs around the time of the shooting. The trial court found only one mitigating circumstance—namely, that Baker pled guilty to the sentence enhancement for committing the felony offense with a firearm. The trial court sentenced Baker to thirty years in the Department of Correction and enhanced that sentence by fifteen years for his use of a firearm in the commission of a felony, for an aggregate sentence of forty-five years. Baker now appeals.

## Analysis

### I. Jury Instruction

[15] Baker argues that the trial court erred in refusing his tendered jury instruction on reckless homicide as a lesser-included offense of murder. The proper instruction of the jury rests within the sound discretion of the trial court, and we review its decisions for an abuse of discretion. *Barnes v. State,* 952 N.E.2d 420, 424 (Ind. Ct. App. 2010). Jury instructions are to be considered as a whole and in reference to each other, and the trial court's ruling will not be reversed unless the instructions, taken as a whole, misstate the law or mislead the jury. *Id.*

[16]     To determine whether to instruct a jury on a lesser-included offense, the trial court must engage in a three-part analysis. *Isom v. State*, 31 N.E.3d 469, 485 (Ind. 2015). The first two parts require the trial court to consider whether the lesser-included offense is inherently or factually included in the greater offense. *Id*. If it is, "then the trial court must determine if there is a serious evidentiary dispute regarding the element that distinguishes the lesser offense from the principal charge." *Id*. It is well-settled that reckless homicide is an inherently lesser-included offense of murder. *Fishers v. State,* 810 N.E.2d 674, 679 (Ind. 2004).

[17]     Because the trial court found no serious evidentiary dispute existed, we will reverse only if that finding was an abuse of discretion. *See Young v. State*, 699 N.E.2d 252, 255 (Ind. 1998). In our review, "[W]e accord the trial court considerable deference, view the evidence in a light most favorable to the decision, and determine whether the trial court's decision can be justified in light of the evidence and circumstances of the case." *Fish v. State*, 710 N.E.2d 183, 185 (Ind. 1999).

[18]     In considering whether there is a serious evidentiary dispute, the trial court examines the evidence presented by both parties regarding the element(s) distinguishing the greater offense from the lesser one. *Young*, 699 N.E.2d at 255. This analysis requires the trial court to evaluate the "weight and credibility of [the] evidence," and then determining the "seriousness of any resulting dispute." *Fish*, 710 N.E.2d at 185.

> Reckless homicide is a killing committed with a plain, conscious, and unjustifiable disregard of harm that might result, and such disregard involves a substantial deviation from acceptable standards of conduct. Ind. Code §§ 35-42-1-5 and 35-41-2-2(c). Murder, on the other hand, requires as a minimum a killing committed by a perpetrator who engaged in the killing with an awareness of a high probability that he was doing so. Ind. Code §§ 35-42-1-1 and 35-41-2-2(b).

*Turner v. State,* 751 N.E.2d 726, 731 (Ind. Ct. App. 2001). The distinguishing element between knowing murder and reckless homicide is culpability. *Compare* Ind. Code § 35-41-2-2(b) ("A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so.") *with* Ind. Code § 35-41-2-2(c) ("A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct.").

[20] In support of his contention that the trial court erred in refusing his tendered instruction, Baker relies heavily upon *Turner,* 751 N.E.2d, and *Young,* 699 N.E.2d 252. In these cases, the court on appeal found that there was a serious evidentiary dispute regarding the element that distinguished the lesser-included offense from the principal charge, such that the trial court had erred in refusing the defendants' tendered instructions as to the lesser-included offense(s). Baker's reliance on these cases is misplaced here. *Turner* and *Young* involved defendants who fired gunshots indiscriminately into crowds of people; these cases are readily factually distinguishable from the instant scenario in which

Baker spotted Ocke-Hall—a person with whom Baker had a dispute—from a distance, leveled a gun at him, ran toward him and, after closing the distance between them, discharged the weapon into Ocke-Hall's chest at close range.

[21] Here, we find that the trial court did not abuse its discretion in refusing to give Baker's proposed jury instruction as to reckless homicide. The State presented evidence, including video surveillance footage that shows the shooting; it depicts Baker pointing a semi-automatic handgun at Ocke-Hall and running toward him. The video footage further shows Ocke-Hall backing away from Baker and Baker shooting him in the chest at point-blank range. *See Turner,* 751 N.E.2d at 731 (holding that an instruction on reckless homicide was not warranted if there was no serious evidentiary dispute but that defendant committed the attacks with an awareness of a high probability that he was engaged in killing). Although Baker "vacillated between a claim that the shooting was [an] accidental [gun misfire] and a claim that he blacked out from drug use and did not remember the shooting," neither of these scenarios is akin to the defendants' reckless intent in *Turner* and *Young*. Appellant's Br. p. 19.

[22] Based on the totality of the evidence, we conclude that there was no serious evidentiary dispute regarding (1) the "knowingly" or "intentionally" mens rea element of murder where Baker targeted and shot Ocke-Hall in the chest at close range; and (2) whether Baker was aware that there was a high probability that his actions would result in Ocke-Hall's death. The trial court did not abuse its discretion in declining to give Baker's proposed instruction on reckless homicide.

## *II. Sentencing*

[23] Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007). So long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion. *Id.* An abuse of discretion will be found where the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* A trial court may abuse its discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. *Id.* at 490-91. If a trial court abuses its discretion by improperly considering an aggravating circumstance, we need to remand for resentencing only "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Anglemyer*, 868 N.E.2d at 491.

[24] First, Baker contends that the trial court abused its discretion when it found his alleged lack of remorse to be an aggravating factor before imposing sentence. An abuse of discretion in identifying or not identifying aggravators and mitigators occurs if it is "'clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual

deductions to be drawn therefrom.'" *Anglemyer*, 868 N.E.2d at 490 (quoting *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)).

At his sentencing hearing on June 8, 2017, Baker stated, "I know sorry will never be enough to bring [Ocke-Hall] back, and nothing I can say can provide closure to such a great loss, so I put myself before you and at the mercy of the Court today just asking that you forgive me as I learn to forgive myself." Tr. Vol. II p. 22.

Although Baker claimed to be remorseful, the trial court was not at all obligated to accept his expression of remorse as sincere. *See Hape v. State*, 903 N.E.2d 977, 1002-03 (Ind. Ct. App. 2009) (explaining that "our review of a trial court's determination of a defendant's remorse is similar to our review of credibility judgments: without evidence of some impermissible consideration by the trial court, we accept its determination"), *trans. denied*. The trial court did not abuse its discretion in this regard. In any event, even if the trial court had abused its discretion in identifying this aggravating circumstance, reversal would not be warranted because, as we explain below, Baker's aggregate forty-five-year sentence is not inappropriate. *See Pickens v. State,* 767 N.E.2d 530, 535 (Ind. 2002) (holding that "a sentence enhancement may be upheld if other valid aggravators exist").

### III. Inappropriateness of Sentence

Next, Baker contends that his aggregate forty-five-year sentence is inappropriate in light of the nature of his offense and his character. The authority granted to

this Court by Article 7, § 6 of the Indiana Constitution permitting appellate review and revision of criminal sentences was implemented by the Indiana Supreme Court through Appellate Rule 7(B). We may "revise a sentence authorized by statute if, after due consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). The primary purpose in this type of review is to "leaven the outliers" and focus on the aggregate sentence for the crime(s) committed. *Caldwell v. State,* 895 N.E.2d 1219, 1125 (Ind. 2008). The appellant bears the burden of "persuad[ing] the appellate court that his or her sentence has met this inappropriateness standard of review." *Kimbrough v. State,* 979 N.E.2d 625, 630 (Ind. 2012) (quoting *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006)).

[28] The advisory sentence is only "the starting point the Legislature has selected as an appropriate sentence for the crime committed." *Anglemyer,* 868 N.E.2d at 494. The advisory sentence for a Level 2 felony is seventeen and one-half years, with the range being ten to thirty years. The trial court imposed a maximum sentence of thirty years and enhanced it by fifteen years for Baker's use of a firearm in the commission of the offense, for an aggregate sentence of forty-five years.

[29] As to the nature of the offense, Baker—enraged over a perceived slight and a $75 debt owed him by someone else entirely—used deadly force in an unprovoked, deadly attack on Ocke-Hall, whom he called his "good friend." *See* Tr. Vol. IV p. 141. Baker spotted Ocke-Hall from a distance, levelled a

semi-automatic handgun at him, ran toward him, shot him in the chest at close range, and fled. Ocke-Hall died from the gunshot wound.

[30] Regarding Baker's character, twenty-four-year-old Baker has prior juvenile adjudications for Class B misdemeanor battery (X 2), Class D felony criminal recklessness, Class B misdemeanor criminal mischief, Class A misdemeanor intimidation, Class D felony theft, and Class B misdemeanor possession of a knife on school property. His adult criminal history includes convictions for Class A misdemeanor battery resulting in bodily injury, Class A misdemeanor possession of marijuana, Class D felony theft, Level 5 felony intimidation where he drew or used a deadly weapon, and Level 6 felony battery with moderate bodily injury. Baker's is a quintessential example of a criminal history of escalating violence.

[31] Additional insight into his character may be gleaned from his post-arrest conduct. Baker sought to coordinate his and Brandi's stories; attempted to scuttle law enforcement's efforts to gain useful information from Brandi; schemed to be charged with a lesser-offense; and blamed his substance abuse and an improbable gun misfire for his deadly actions.

[32] Further still, his history of substance abuse reflects very poorly on his character. According to the pre-sentence investigation report,

> [T]he defendant reported he's used K-2, Marijuana and Benzodiasepines [sic] in his past but stated that the only drug that he used with any regularity was K-2; he reported being a daily

user of K-2 between 2010 and 2013; at his heaviest, he was smoking about a gram a day. . . .

App. Vol. II p. 158. Based upon Baker's unchecked substance abuse, unwillingness to conform his conduct, and his record of escalating violence that ultimately left his "good friend" dead, we cannot say that an aggregate sentence of forty-five years is inappropriate in light of the nature of the offenses or his character.

## Conclusion

[33] The trial court properly refused Baker's tendered jury instruction regarding reckless homicide. The trial court did not abuse its discretion in sentencing Baker; his sentence is not inappropriate. We affirm.

[34] Affirmed

[35] Vaidik, C.J., and Pyle, J., concur.